IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-02015 - PKH |
| | ) | |
| $180,886 UNITED STATES CURRENCY, | ) | |
| Defendant | ) | |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, by and through its undersigned attorneys, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure and 18 U.S.C. §§ 983 and 985:

## NATURE OF THE ACTION

1.      This is an action to forfeit property to the United States as property that is proceeds of or involved in violations of 21 U.S.C. §§ 841 et seq. and as such is forfeitable pursuant to 21 U.S.C. § 881(a)(6).

## THE DEFENDANT *IN REM*

2.      The defendant property consists of $180,886 in United States Currency ("the Defendant Currency") that was seized from Shapour Saberi ("SABERI"), Aryan Rasul Ibrahim ("IBRAHIM"), and Redeer Ali Haji ("HAJI") at the following location:  near Mile Marker Number One (1) of Interstate 40, in Crawford County, Arkansas, which is in the Western District of Arkansas, Fort Smith Division.  Funds representing the value of the Defendant Currency are presently in the custody of the United States Marshals Service (USMS).

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.      This Court has *in rem* jurisdiction over the defendant property:

    a.      pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; and/or

    b.      pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the action accrued in this district.

5.      Venue is proper in this district:

    a.      pursuant to 28 U.S.C. §1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district; and/or

    b.      pursuant to 28 U.S.C. § 1395, because the action accrued in this district.

## BASIS FOR FORFEITURE

6.      The Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

7.      At approximately 1:27 p.m. on January 17, 2023, near mile marker number one of Interstate 40 westbound, which is in Crawford County, Arkansas, in the Western District of Arkansas, Fort Smith Division, Arkansas State Police (ASP) Trooper First Class Chris Short

("TFC Short"), in the course of his duties, conducted a traffic stop of a gray-colored 2020 Nissan Armada sport utility vehicle (SUV) with three occupants:  SABERI, IBRAHIM, and HAJI.

8.      The SUV displayed a Tennessee license plate and was registered to Music City Car Rentals Inc., in Nashville, Tennessee.

9.      TFC Short approached the SUV and identified the driver as SABERI.  SABERI appeared to be extremely nervous, and his hands were trembling.

10.      TFC Short asked SABERI to accompany him back to his ASP patrol vehicle so he could issue SABERI a warning and check his driver's license status.  While TFC Short spoke with SABERI, SABERI's carotid artery was visibly beating in his neck and his lip was quivering.  Even after TFC Short told SABERI he wasn't in any trouble, SABERI remained visibly nervous.

11.      SABERI told TFC Short that he and the two other occupants of the vehicle were travelling to Oklahoma to buy a car.  TFC Short asked SABERI what type of car they intended to purchase, and SABERI responded that he did not know what kind of car they intended to purchase.

12.      TFC Short then asked SABERI where in Oklahoma they were travelling.  SABERI stated, "Uh, I forgot, I think like Tulsa."

13.      TFC Short then asked SABERI for the names of the other SUV occupants. SABERI provided TFC Short with IBRAHIM's first name only, and stated he did not know the rear passenger well and could not remember his name.

14.      TFC Short then approached the vehicle to retrieve the rental agreement and ask the other occupants for their identification.  He identified the other two occupants from their Tennessee driver's licenses:  HAJI was in the front passenger seat, and IBRAHIM was in the rear driver-side passenger seat.

15.     IBRAHIM and HAJI told TFC Short they were going to a casino in Oklahoma. When TFC Short asked for additional detail, both stated they could not recall what casino they were going to, nor exactly where in Oklahoma they were travelling.

16.     When TFC Short asked about the vehicle rental agreement, HAJI stated that he owned the Music City Rental company, and that the three SUV occupants were going to stay in Oklahoma for two or three days.

17.     While still in the ASP vehicle, TFC Short asked SABERI if there were any guns, drugs, or large amounts of currency in the vehicle, to which SABERI stated, "no."  TFC Short asked SABERI for his consent for TFC Short to search the vehicle SABERI was driving.  SABERI refused.

18.     TFC Short then approached the SUV and asked IBRAHIM and HAJI if there were any guns, drugs, or large amounts of currency in the vehicle, to which IBRAHIM and HAJI stated, "no."  TFC Short asked IBRAHIM and HAJI for their consent for TFC Short to search the vehicle they were occupants of. Both parties refused.

19.     At approximately 1:40 p.m. on January 17, 2023, ASP Corporal Josh Elmore ("CPL Elmore") and his K-9 partner, "Beau," arrived at the scene of the traffic stop.  Both CPL Elmore and Beau are certified through the ASP Narcotics Detector Dog Team.  This certification follows the performance requirements as set forth by Poleizispurhundprufungen (PSP2) Police Scenting Dog Test and the requirements of the ASP's Canine Program.

20.     CPL Elmore presented Beau to the SUV to conduct a free air sniff of the SUV. Beau alerted, indicating detection of the odor of illegal drugs coming from the SUV.

21.     During their probable cause search of the SUV, troopers located a Glock semi-automatic handgun that had previously been reported stolen, a Ruger semi-automatic handgun, a

chocolate bar containing four (4) grams of psychedelic mushrooms (a Schedule I controlled substance), a THC vape cartridge (a Schedule I controlled substance), and undetermined amounts of U.S. currency.

22.     The stolen Glock semi-automatic handgun and a large amount of U.S. currency were found inside of a white backpack, which IBRAHIM admitted was his.   The following photograph depicts the white backpack and its contents:



23.     The Ruger semi-automatic handgun, 4-gram package of edible psychedelic mushrooms, and a large amount of U.S. currency were found inside of a red backpack, which HAJI admitted was his.  The following photograph depicts the red backpack and its contents:



24.     A large amount of U.S. currency, later determined to be $4,800, was found inside of a black backpack in the second-row seating area, which, in addition to the THC vape cartridge located inside the center console, SABERI admitted was his.

25.     A large amount of U.S. currency was found inside of a black bag, which was found in the third-row seating area, which IBRAHIM admitted was his.  The following photograph depicts the black bag and its contents:



26.     The total amount of U.S. currency found in the SUV was $180,886.

27.     A total of seven telephones (collectively, "the Target Telephones") (individually identified as "Target Telephone #1" through "Target Telephone #7") were found inside of the SUV.

28.     All three subjects were arrested and taken to the 12th/21st Judicial Drug Task Force (JDTF) office for further processing and interviews.

*Interview of SABERI*

29.     On January 17, 2023, Drug Enforcement Agency (DEA) Special Agent Michael Brooks ("SA Brooks") interviewed SABERI at the JDTF office.  After having been advised of his Miranda rights, SABERI agreed to speak with SA Brooks regarding the facts surrounding the incident.  During the interview, SABERI made the following statements, amongst others:

    a.     In answer to the question whether he had ever been arrested, SABERI stated he used to have a drug problem (heroin) in the past and used to engage in theft.

    b.     SABERI stated IBRAHIM and HAJI had previously asked him if he wanted to go to "OKC," which is a common nickname for Oklahoma City, and SABERI had agreed.

    c.     SABERI stated he just wanted to go to the casino.

    d.     SABERI later stated he thought they were going to Tulsa, Oklahoma.

    e.     SABERI admitted that the black backpack was his and that he had approximately $4,500 to $5,000 inside.

    f.     SABERI stated he intended to use this money at the casino.

     g.     SABERI stated IBRAHIM and HAJI intended to purchase a vehicle in Oklahoma.

     h.     SABERI stated he had two iPhones in his possession during this incident. SABERI stated one of these iPhones does not have service. SABERI provided the telephone number to his iPhone that did have service.

*Interview of HAJI*

30.     On January 17, 2023, SA Brooks interviewed HAJI at the JDTF office. After having been advised of his Miranda rights, HAJI agreed to speak with SA Brooks regarding the facts surrounding the incident. During the interview, HAJI made the following statements, amongst others:

     a.     HAJI stated the only property he had on him during this incident was one iPhone and a red backpack.

     b.     HAJI stated they were headed to a casino in Oklahoma, but he did not know exactly where they were going.

     c.     HAJI stated he just had some money on him and was going to a casino.

*Attempted Interview of IBRAHIM*

31.     On January 17, 2023, SA Brooks met with IBRAHIM at the JDTF office. SA Brooks introduced himself to IBRAHIM as an agent with the DEA. SA Brooks showed IBRAHIM his DEA-issued credentials and badge. SA Brooks explained to IBRAHIM the reason he wished to speak with IBRAHIM. SA Brooks advised IBRAHIM of his Miranda rights. IBRAHIM stated he did not wish to speak with SA Brooks regarding the facts surrounding this incident.

32.     Once the three interviews were complete, SA Brooks and other assisting law enforcement personnel processed evidence and other case-related paperwork at the JDTF office. Part of this process was determining which of the seven cellular telephones belonged to whom.

33.     SABERI identified Target Telephone #1 and Target Telephone #2 as belonging to him.

34.     HAJI identified Target Telephone #3 and Target Telephone #4 as belonging to him.

35.     IBRAHIM identified Target Telephone #5 and Target Telephone #6 as belonging to him.

36.     When asked whose phone Target Telephone #7 was for the purpose of issuing a receipt for the property, no-one admitted to owning it. A short time later, SABERI stated he "guessed" that this phone was his. Immediately after, HAJI attempted to state he would claim ownership of this phone. SA Brooks asked both subjects whose phone it actually was. In response, neither subject claimed ownership.

37.     On January 17, 2023, SA Brooks seized the Defendant Currency.

*Extraction of Digital Evidence from Target Telephones*

38.     On February 22, 2023, SA Brooks obtained a federal warrant to search the seven (7) above-identified Target Telephones and to seize from the phones certain digital evidence.

39.     On March 7, 2023, SA Brooks relinquished custody of Target Telephone #1, Target Telephone #2, Target Telephone #4, Target Telephone #5, and Target Telephone #6 to FBI Special Agent Matt Ferguson ("SA Ferguson") at the FBI Fort Smith Branch Office, to have them sent to the FBI Little Rock Field Office for digital extraction.

40.     SA Brooks maintained custody of Target Telephone #3 and Target Telephone #7, and extracted digital evidence from those devices.

41.     On or about August 15, 2023, SA Brooks obtained a flash drive from SA Ferguson containing extraction files from Target Telephone #2, Target Telephone #4, Target Telephone #5, and Target Telephone #6, contained partial extractions.  All phones sent to the FBI Little Rock Field Office remain there for further processing.

*Target Telephone #2*

42.     SA Brooks conducted a detailed review of the digital evidence seized from Target Telephone #2, a target telephone SABERI admitted to having owned.  The Apple ID associated with this target telephone was listed as an email address containing a name similar to SABERI's first name.

43.     Target Telephone #2 contained numerous "selfie-style" photographs (JPEGs) of SABERI, as well as a photograph of SABERI's Tennessee driver's license.

44.     The following photograph of SABERI was extracted from Target Telephone #2:



45.    The following photograph of SABERI's Tennessee driver's license was extracted from Target Telephone #2, except that certain information is redacted:



46.    Target Telephone #2 contained numerous photographs of what SA Brooks, based on his training and experience as an agent of the DEA, identifies as high-grade marijuana.  The following photograph taken from Target Telephone #2 depict high-grade marijuana:



47.     Target Telephone #2 contained numerous photographs of note applications depicting what SA Brooks, based on his training and experience as an agent of the DEA, identifies as illegal drug sales receipts and illegal drug ledgers detailing the sale of known strains of high-grade marijuana, identified by name/nickname.

48.     The following two images extracted from Target Telephone #2 are screenshots of another device's note application depicting sales receipts for known strains of high-grade marijuana:



49.     The following photograph extracted from Target Telephone #2 is of a drug ledger detailing the sale of known strains of high-grade marijuana:

50.     Target Telephone #2 also contained numerous screenshot images and photographs of tracking receipts and tracking labels.

51.     The following photograph, extracted from Target Telephone #2, depicts a tracking receipt for a package sent via UPS:



52.     The following photograph, extracted from Target Telephone #2, depicts a tracking label for a package purportedly sent from an individual in California from with the last name "Saberi" to a different individual in Nashville, Tennessee, also with the last name "Saberi" via UPS, but with the first names street addresses redacted:



53.    The following photograph, extracted from Target Telephone #2, is a screenshot image taken of the Facebook Messenger application, consistent with the interior of a Sprinter-style cargo van, with the sender asking, "is this still available?"



54.    Target Telephone #2 contained the record of a conversation on the Snapchat application between the user, SABERI (using Snapchat handle "shakour_ss Shakour Srt8"), and another Snapchat user, in which SABERI attempted to barter for the sale of a vehicle in exchange for "gas packs" and U.S. currency.

55.    Based on his training and experience as an agent of the DEA, SA Brooks knows "Gas packs" are a strain of high-grade marijuana.

56.     Target Telephone #2 contained the record of a Snapchat conversation between SABERI and another Snapchat user, in which SABERI (using Snapchat handle "shakour_ss Shakour Srt8") sent the following message:  "I got some gas Mac 1s , purple plate nd some other shit for 8. Same level as what u getting now or better[.]"

57.     Based on his training and experience as an agent of the DEA, SA Brooks knows the purpose of the above message was to inform the other Snapchat user that the writer had multiple strains of high-grade marijuana for sale, including "Gas" and "Mac 1s," both of which are known to him.

58.     Target Telephone #2 contained the record of a Snapchat conversation between SABERI (using Snapchat handle "shakour_ss Shakour Srt8") and another Snapchat user, transcribed below:

> SABERI:      "Tell them gas purple for 1200 for the p"
>
> SABERI:      "I'll be back tomorrow. We fly out at 11am"
>
> USER:        "Okay babe I'll tell them cause someone asked them for a pound he was like I know someone who got some and asked me for a pound LMAOO"
> USER:        "How am I dealer now"
>
> SABERI:      "Lmfao yes yes. Keep it up you ant gotta work anymore"
>
> USER:        "I'm doing it for you"
>
> SABERI:      "Lol do it for u baby make that money"
>
> USER:        "It's your stuff"

59.     Based on his training and experience as an agent of the DEA, SA Brooks knows this was another conversation regarding the sale of high-grade marijuana – "Gas" and "purple" being known strains of high-grade marijuana, "P" being an abbreviation commonly utilized for pound(s), and $1,200 being a typical price for some strains of high-grade marijuana.

*Target Telephone #4*

60.     SA Brooks conducted a detailed review of the digital evidence seized from Target Telephone #4, a target telephone HAJI admitted to having owned.  The Apple IDs associated with this target telephone included email addresses associated with HAJI's name.

61.     Target Telephone #4 contained numerous "selfie-style" photographs (JPEGs) of HAJI.  The following photograph, extracted from Target Telephone #4, is of HAJI:



62.     Target Telephone #4 contained numerous photographs of high-grade marijuana; some of which were identified by strain with labels and with Snapchat-style word banners.

63.     The following two photographs, extracted from Target Telephone #4, depict high-grade marijuana identified by strain with labels:



64.     The following two photographs, extracted from Target Telephone #4, depict high-grade marijuana identified by strain with Snapchat-style word banners:



65.     Target Telephone #4 contained numerous photographs of what SA Brooks, based on his training and experience as an agent of the DEA, knows are drug ledgers detailing the sale of known strains of high-grade marijuana.

66.     The following two photographs, extracted from Target Telephone #4, depict drug ledgers detailing the sale of known strains of high-grade marijuana:



67.     Target Telephone #4 contained a record of the following Snapchat conversation between HAJI (using Snapchat handle "*iamredeer Redeer Haji*") and another Snapchat user:

USER:       "2,450 x 20 all the gas Og"

USER:       "10 x 2, 000 berry whites blue dream pineapple lush"

USER:       "Kush"

HAJI:       "Send me 10 and 10"

HAJI:       "I will cash you out on 40k"

| | | |
|---|---|---|
| HAJI: | "If you can front me some more then do it if the gas gas" |
| USER: | "I'm getting him ready and all bro , we going to Walmart in a bit to get a luggage and all he will be there by the time u get off" |
| HAJI: | "1000 pre rolls" |
| HAJI: | "400 7 bags" |
| HAJI: | "2lbs of fatty packages" |
| HAJI: | "With 2000 pre rolls" |
| HAJI: | "15k straight fattys" |
| HAJI: | "10k edibles" |
| HAJI: | "$12 delivered case our price?" |

68.     Based on his training and experience as an agent of the DEA, SA Brooks knows the above Snapchat conversation pertained to the sale of high-grade marijuana, based on the following terms that were used:  "gas," "berry whites," "blue dream," and "pineapple kush" are all strains of high-grade marijuana; "pre rolls" are marijuana cigarettes already rolled with marijuana inside; "edibles" are consumable products infused with marijuana.

69.     Target Telephone #4 contained numerous other records of Snapchat conversations between HAJI (using Snapchat handle "*iamredeer Redeer Haji*") and other Snapchat users regarding the sale of marijuana.

*Target Telephone #5 and Target Telephone #6*

70.     SA Brooks conducted detailed reviews of the digital evidence seized from Target Telephone #5 and Target Telephone #6 ("IBRAHIM's phones"), both of which IBRAHIM admitted to having owned.  The following Apple IDs associated with both target telephones included two email addresses containing IBRAHIM's first name.

71.     IBRAHIM's phones both contained numerous "selfie-style" photographs (JPEGs) of IBRAHIM, two of which appear below:



72.     One of IBRAHIM's phones contained an image of IBRAHIM's passport and Tennessee driver's license, depicted below:



73.     IBRAHIM's phones contained hundreds of photographs of high-grade marijuana; several of which were identified by type of strain with a Snapchat-style word banner, including the two photographs below:



74.     The following Snapchat account names were associated with both of IBRAHIM's phones: KP Menu, KP Official (dotprimo), KPFarm420, KPFarmss, KPFarmss2, KPFarms (Kpfarmsofficial), KP Official (mr_ceokp), and KP Official (millionaireway).

75.     IBRAHIM's phones contained numerous screenshot images of the Snapchat account titled, "KP Menu."  These screenshots, including the three below, were of KP Menu advertising different strains of high-grade marijuana for sale.  In the first photograph below, KP Menu advertised "Inventory Available To Be Shipped."  In the second photograph below, KP

Menu stated that "[w]e working just because we ain't posting boxes going out we working and we shipping ahaha[.]"



76.    IBRAHIM's phones contained numerous screenshot images of SMS text messages and Snapchat conversations detailing the sale and shipping of marijuana, including the following three images, but with certain information redacted:





77.   IBRAHIM's phones contained numerous photographs of vacuum-sealed marijuana packaged in cardboard boxes, with amounts hand-written on these boxes, including the two images below:



78.   One of IBRAHIM's phones contained the following screenshot image, advertising for Instagram handle, "@kpfarm420main" which stated, "We broke our own record lmao we shipped out 150 lbs in one day."



79.     IBRAHIM's phones contained numerous photographs and screenshot images of photographs of shipping labels, with recipient address throughout the United States.  Some of the sender addresses were from source states for marijuana, and some of the sender addresses did not exist in U.S. Postal Service records.  Three such photographs appear below:



80.     IBRAHIM's phones contained numerous photographs of banded U.S. currency, similar to the organization of the Defendant Currency seized from SABERI, HAJI, and IBRAHIM on January 17, 2023.  Three such images appear below, with the third displaying a large amount of marijuana, next to the banded U.S. currency.



81.    IBRAHIM's phones contained numerous photographs of what SA Brooks, based on his training and experience as an agent of the DEA, knows are drug ledgers detailing the sale of known strains of high-grade marijuana, including the following image:



82.    One of IBRAHIM's phones contained the following photograph of a drug ledgers detailing known strains of high-grade marijuana and dated "1/15."  In this photograph, the total amount of profit shown on this drug ledger was $178,450—an amount only $2,436 less than the Defendant Currency seized from SABERI, HAJI, and IBRAHIM on January 17, 2023.



83.    One of IBRAHIM's phones contained the following photograph of the inside of a Sprinter-style cargo van, taken from the rear of the van with the rear doors open and showing the van to be filled with several large black trash bags.  This photograph contained a word-banner with the Instagram handle, "@DOTKP."



84.     IBRAHIM's phones contain records of several references to "DOT," which appears in the photograph above, who SA Brooks, based on his training and experience as an agent of the DEA, believes is someone involved in IBRAHIM's marijuana drug trafficking organization (DTO).

85.     IBRAHIM's phones contain records of several references to "KP," which appears in the photograph above, in conjunction with "KP Farms" and other variations.  SA Brooks, based on his training and experience as an agent of the DEA, knows "KP Farms" and other variations are the handles of Snapchat pages that solicit high-grade marijuana for sale.

86.     Additionally, the van depicted in the above photograph is similar to the van pictured in the Facebook Marketplace screenshot image from SABERI's target telephone (see ¶ 53, *supra*), apparently seeking to acquire such a van.  Based on these two photographs found in each of these co-conspirator's phones, SA Brooks believes, based on his training and experience as an agent of the DEA, that SABERI and worked together IBRAHIM to acquire the above-depicted Sprinter-style cargo van to transport bulk-amounts of high-grade marijuana.

87.     One of IBRAHIM's phones contained the record of a January 17, 2023, Snapchat conversation between IBRAHIM (using Snapchat handle "kpofficial_snap KP Official") and another Snapchat user.  The following is an excerpt from this conversation between IBRAHIM and the other user, which took place on the day of the seizure of the Defendant Currency:

USER:        Is there any packs available bro? I need some good priced indoor or smalls

IBRAHIM:    On the way to farms right now

88.     Based on his training and experience as an agent of the DEA, SA Brooks knows that the reference to "indoor" or "smalls" are references to qualities of marijuana, and that marijuana farms are utilized to harvest a different range of qualities of marijuana.

89.     One of IBRAHIM's phones contains the records of a January 13, 2023, Snapchat conversation between IBRAHIM (using Snapchat handle "kpofficial_snap KP Official") and another Snapchat user.  The following is an excerpt of this conversation, which took place four days prior to  the seizure of the Defendant Currency:

| | |
|---|---|
| IBRAHIM: | Fa sho man.   I might sell the page bro the whole operation. I got it pending |
| USER: | Damn why? |
| IBRAHIM: | Someone offered me 2.5 million |
| USER: | Thought yall getting back into it |
| USER: | It's worth more than that |
| IBRAHIM: | I know man but idk it's not something I wanna do forever you know |
| IBRAHIM: | If I get 2.5 at one time I can do legal shit with that and make a lot |
| USER: | Mann hope ya'll don't fam I was looking forward to it |
| USER: | Yea that's true going legal is smart |
| USER: | Especially wit how far ya'll made it |
| USER: | I just need to make my M and imma start my own legal business |
| IBRAHIM: | Yea bro you know it's like keep going or be smart and take that money and get out |
| USER: | Yea facts well I mean if u did decide to do that could I get a promo from ya'll ? I'm tryna reach my goal and get out lol |
| IBRAHIM: | Eventually something is bound to happen at one point |
| USER: | Yea I'm kinda worried about that as well cause it takes 1 wrong move to have it end |
| IBRAHIM: | Man once he confirms it I got you bro |

USER:        Ya'll gonna go legal into cannabis?

IBRAHIM:     Plus Omar he's been tryna leave the country too you know

IBRAHIM:     It's cuz of me he's still here

IBRAHIM:     He don't like doing this work bro just to be honest with you

USER:        Is it the risk that's contiplating all that ?

IBRAHIM:     Na bro we always talked about getting out you know

IBRAHIM:     We been taking about it for years

IBRAHIM:     It's not official bro it's just something we been talking about a lot lately and I presented it to someone and he agreed with 2.5 but I think he wants to do 1.5 up front and rest later but I don't wanna do that and I don't think he can do 2.5 up front so idk bro more then likely we still gonna finish this 2023 you know

90.     One of IBRAHIM's phones contains the records of a January 10, 2023, Snapchat conversation between IBRAHIM (using Snapchat handle "kpofficial_snap KP Official") and another Snapchat user.  The following is an excerpt of this conversation, which took place seven days prior to  the seizure of the Defendant Currency:

USER:        I'm just being honest last time he got mad and he stop letting me order for over 6 months because I reached out to you but I'm so player I just be going off his word Frfr and that ain't 100 because I be having plays be you taking two weeks and no communication is not right and I make sure I do my part and sometimes he forget I owe him money and I STILL TELL HIM AND PAY HIM because I'm to player I want to build no keep going through obstacles. I been missing with you for a min no cap 100 At least you know I ain't lying tho if everyone is saying it tho

IBRAHIM:     At the end of the day bro like I said I'm coming back to take over so he get mad or not it's not gonna effect anything cuz ima be taking the orders you feel  .  It's my operation I built this nobody did but me nobody put monet in but me so you don't got to worry about nothing  .  That's my cousin he's

> solid bro I'm not saying is isn't but he's just to slow bro and in this trap game being slow is losing customers simple as that

91.     Based on his training and experience as an agent of the DEA and the facts gathered in this investigation, SA Brooks believes the other Snapchat user in the above conversation is not pleased with IBRAHIM's current business, and that IBRAHIM's statements are assurances to this user that IBRAHIM is "coming back to take over."  When IBRAHIM states, "It's my operation I built," SA Brooks believes IBRAHIM claims responsibility as the person in charge of the marijuana drug trafficking organization responsible for shipping high-grade strains of marijuana to customers throughout the U.S. and elsewhere.

*Administrative Forfeiture Proceedings*

92.     The DEA then begun administrative forfeiture proceedings to forfeit the Defendant Currency, and on March 30, 2023, SABERI, HAJI, and IBRAHIM filed a claim to the Defendant Currency.

93.     In their claim, SABERI, HAJI, and IBRAHIM stated, under penalty of perjury, that they had an ownership interest in the Defendant Currency because, "[o]wnership of the assets were obtained legally without felonious conduct."

94.     During the administrative forfeiture proceedings, counsel for IBRAHIM provided the Government with what were purported to be two bills of sale.  The first purported bill of sale represented that Los Hermanos LLC paid $130,000 cash to IBRAHIM on January 10, 2023, for the purchase of a 2011 Rolls-Royce Ghost.  The second purported bill of sale represented that IBRAHIM sold a 2020 Dodge Charger on December 31, 2022, with a sale price of $65,000, and a trade-in of $40,000.  The second purported bill of sale does not indicate how the $25,000 difference was paid to IBRAHIM.

*Agent's Conclusions*

95.     Based on his training and experience as an agent of the DEA and the facts presented, namely the circumstances of the traffic stop, the manner in which the Defendant Currency was found and bundled for ease of counting (i.e., "bulk currency"), the conflicting statements of SABERI and HAJI, and the overwhelming evidence found in the target telephones, SA Brooks concludes that SABERI, HAJI, and IBRAHIM worked in partnership to acquire and distribute a wide range of different strains and qualities of marijuana and edibles to customers throughout the United States.  Specifically, SA Brooks concludes that these individuals solicited customers to order marijuana and edibles through the Snapchat, Instagram, and other social media platforms. Customers placed their orders and paid for the orders in advance.  Once a customer's payment was received, another co-conspirator in California would and did then send that customer's order through a common carrier such as UPS or FedEx, or via the U.S. Postal Service.  SA Brooks also concludes that profits from these sales were supplied to the SABERI's, HAJI's, and IBRAHIM's source of supply in the form of bulk currency.  On January 17, 2023, $180,886, was seized from SABERI, HAJI, and IBRAHIM, almost all in the form bulk U.S. currency, as they were found traveling westbound on Interstate 40, in the direction of California.  Also, in their possession were two loaded handguns and a detailed drug ledger.  SA Brooks concludes that the two loaded handguns were possessed by these individuals to protect themselves and their illicit proceeds during their travels.  SA Brooks concludes that the $180,886 in U.S. currency was profit from the sale of marijuana and edibles, as detailed in the drug ledger entry dated "1/15" and was being used to either pay a drug-related debt owed to their supplier, to acquire additional amounts of high-grade marijuana and edibles from their supplier, or both.

<u>CLAIM FOR RELIEF</u>

WHEREFORE, the United States of America respectfully requests that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed, that judgment be entered declaring the Defendant Currency condemned and forfeited to the United States of America for disposition according to law, and that the United States of America be granted such other relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

DAVID CLAY FOWLKES
UNITED STATES ATTORNEY

By:   /s/Steven M. Mohlhenrich

Steven M. Mohlhenrich
Assistant United States Attorney
Maryland Bar No. 9212160240
414 Parker Avenue
Fort Smith, Arkansas  72901
steven.mohlhenrich@usdoj.gov